Lavoie v. Betz Lab. et al.        CV-00-586-B    7/12/02

### UNITED STATES DISTRICT COURT FOR THE
### DISTRICT OF NEW HAMPSHIRE


**Jeffrey A. Lavoie**

**v.**                                        Civil No. 00-586-B
                                              Opinion No. 2002 DNH 130
**Betz Laboratories, Inc.**
**LTD Benefits Plan and**
**Metropolitan Life**
**Insurance Company**


**MEMORANDUM AND ORDER**


Jeffrey Lavoie, who has multiple sclerosis, received long term disability benefits through a plan provided by his employer, Betz Laboratories, Inc.  When his benefits were discontinued after two-and-one-half years, Lavoie brought suit under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C.A. § 1132(a)(1)(B), against Betz Laboratories, Inc. LTD Benefits Plan (the "Plan") and Metropolitan Life Insurance Company ("MetLife").  The defendants move for summary judgment, contending that MetLife's decision to discontinue Lavoie's benefits was not arbitrary and capricious.


### I.

Jeffrey Lavoie is a college graduate with a degree in chemistry.  He began working for Betz Laboratories, Inc. in

chemical sales in 1989.  As a Betz employee, Lavoie was eligible to participate in the company's Long-Term Disability Benefits Plan.  The terms of the Plan are described in a booklet titled "Your LTD Benefits Plan."

## A.   THE PLAN

The Plan defines "Total Disability" to mean, for the first 24 months, that the claimant is "completely and continuously unable to perform each of the material duties of [his] regular job [and] . . . require[s] the regular care and attendance of a Doctor."  Record at 5.  After 24 months, the Plan adds a requirement that the claimant "must also be continuously unable to perform the duties of any work or service for which [he is] reasonably qualified, taking into consideration [his] training, education, experience and past earnings."  Id.

A claimant may engage in "Rehabilitative Employment" without losing his right to collect disability benefits.  Rehabilitative Employment "means that [the claimant], while unable to perform all of the material duties of [his] regular job, [is] performing: 1. at least one of the material duties of [his] regular job on a part-time or full-time basis; or 2. the duties of any other gainful work or service for which [he is] reasonably qualified taking into consideration [his] training, education and

2

experience." Record at 5. During the first 24 months, a claimant's benefit will be reduced because of Rehabilitative Employment only to the extent that the sum of any income earned through such employment and the claimant's benefit exceeds his "Indexed Basic Monthly Earnings."[1] After 24 months, the benefit also will be reduced by 50% of any income earned through Rehabilitative Employment.

The "Monthly Benefit" payable to a disabled person under the Plan "is the lesser of: (1) the Maximum Monthly Benefit . . . minus Other Income Benefits; (2) 60% of Basic Monthly Earnings minus Other Income Benefits; or (3) 100% of Basic Monthly Earnings minus Other Income Benefits and compensation earned from Rehabilitative Employment."[2] Record at 3.

---

[1] Indexed Basic Monthly Earnings are "Basic Monthly Earnings . . . increased by 7%" per year. Record at 4. For a salesperson such as Lavoie, "Basic Monthly Earnings" include the claimant's monthly rate of pay when he became disabled plus "commissions and/or bonuses which shall be averaged for the 36 months preceding the date total disability started . . . ." Id.

[2] This case does not concern the Maximum Monthly Benefit. Nor does it concern Other Income Benefits. Thus, I omit the definitions of these terms. Further, I do not attempt to resolve the apparent conflict between the Plan's definition of Monthly Benefit, in which the Monthly Benefit is limited to the extent that, when combined with Other Income Benefits and compensation received from Rehabilitative Employment, it exceeds the claimant's Basic Monthly Earnings, and the provision discussed above, which uses Indexed Monthly Earnings to determine any reduction in the claimant's benefit resulting from Rehabilitative

3

## B. THE CLAIM

Lavoie was diagnosed with multiple sclerosis in July 1992, when he was twenty-eight years old. His treating physician, Dr. Levy, reported that Lavoie remained symptom free until October 1995, when he noted some heaviness in his legs.

In July 1996, Lavoie reported that he was experiencing fatigue and heat sensitivity. In September, Lavoie told Dr. Levy that he was thinking of looking into disability benefits because he was experiencing extreme fatigue caused by multiple sclerosis which was interfering with his work. Dr. Levy prescribed several medications during the fall but none were beneficial. Lavoie continued to work until January 19, 1997.

Lavoie completed an application for long-term disability benefits on June 18, 1997. Dr. Levy wrote the following in support of Lavoie's application:

> As you know, Mr. Lavoie has relapsing, remitting multiple sclerosis. At the present time, he is not on medication since some trials of medications did not help. In terms of restrictions and limitations, the patient should have an occupation that does not physically place extreme demands upon him. This also applies to extreme stress and very long hours. I think that he would be fit to work in a light capacity commensurate with his educational level, for a 40-50 hour work week, maximum. Because of his MS, he should obtain rest, and take care of himself in general. He should avoid hot environments. One of the problems

Employment.

4

> with his last job was that it involved exposure to heat
> and he had heat sensitive illness. In other words, his
> MS would worsen upon heat exposure.

Record at 96. Lavoie's application for benefits was approved in late July 1997. His monthly benefit was determined to be $4,974.11.[3] See Record at 142.

Lavoie found a new job as a financial planner with Prudential and started work on October 20, 1997. In December 1997, Lavoie earned his stockbroker's license, and in March 1998, he became a licensed insurance agent. At Prudential, Lavoie was guaranteed a salary of $3,000 per month during a training period which was to end on April 1, 2000. Thereafter, he was to be paid on commission only. In 1999, Lavoie earned a bonus of $14,500.00, which he received in early 2000. He earned a total of $47,643.00 in 2000, including the 1999 bonus. As of December 2001, Lavoie expected that he would earn no more than $30,000 in commissions for the entire year.

On May 27, 1999, MetLife informed Lavoie that his claim for benefits was being reviewed in anticipation of the additional requirements that would apply to his claim after the initial 24-month period expired on July 19, 1999. In a letter dated July 8,

---

[3] The Record elsewhere suggests that Lavoie's Basic Monthly Benefit was $4,965.28. See Record at 98. I do not attempt to resolve this apparent discrepancy.

1999, MetLife, without explanation, informed Lavoie that he had been determined not to be disabled and that his benefits would end on July 19. Lavoie appealed the decision, noting that he was still earning only about one quarter of what he had earned at Betz. MetLife reinstated his benefits in October 1999, pending further investigation.

MetLife retained a Vocational Rehabilitation Consultant to conduct a Transferable Skills Analysis for Lavoie in December of 1999. The consultant assumed that Lavoie was capable of working at a medium exertional level except that he could not engage in activities that would involve exposure to marked changes in temperature and humidity. Based on Lavoie's skills, background, and capabilities, the consultant concluded that he could work as a financial planner, a sales agent in financial services, or a manufacturer's representative. The median wage in financial planner jobs in New Hampshire was reported to be $5,430.00 per month, the median wage for sales agent positions in financial services was determined to be $5,430.00 per month, and the median wage for manufacturers' representative positions was reported to be $3,605.00 per month. The consultant also reported that there were full-time jobs in those positions available in the Bedford, New Hampshire area.

The same consultant provided MetLife with a Labor Market Survey in January of 2000. The survey listed seven available financial service positions, three in Boston and one in Worcester, Massachusetts, and one each in Bedford, Manchester, and Portsmouth, New Hampshire. Only three of the positions listed salaries, which were in the $30,000 per year range or less.

On March 13, 2000, MetLife informed Lavoie that its investigation was complete and that it had terminated his benefits as of the end of February 2000. MetLife explained its decision by stating:

> [b]ased on your education, training and experience and considering your capabilities, restrictions and limitations a Transferable Skills Analysis and Labor Market Survey were performed identifying transferable skills as a financial planner, financial services sales agent and manufacturing representative. A Labor Market Survey was conducted in your geographic area confirming the existence of positions as Financial Advisor, and Financial Planner.
>
> In addition, you have been working as a Financial Advisor at Prudential Securities from 10/97 to present. As of April 1, 2000 you will have completed all training and production period for the position of Financial Advisor for Prudential. At this point, you will be paid by commission based upon your work productivity. You have received commissions during your production period for 1999, and have demonstrated you

7

> have the ability to earn a comparable salary
> according to your contract language.
>
> Because the above information does not
> support the definition of disability, your
> Long Term Disability claim approval is hereby
> withdrawn, effective (February 29, 2000).

Record at 367.

Lavoie appealed the March 13 decision and provided an additional letter from Dr. Levy about his medical condition. Dr. Levy wrote that Lavoie had experienced a relapse in March that caused numbness in his hands extending up his arms and into his chest. As a result, he had difficulty writing, using the telephone, and typing, which interfered with his work. The condition improved somewhat with medication but did not resolve entirely. Dr. Levy stated that Lavoie was capable of working as a stockbroker but that he could not work at the full rate of sixty to eighty hours a week.

On June 7, 2000, MetLife informed Lavoie that it would not rescind its decision to terminate his benefits. Lavoie then filed suit.

## II.

This case turns on MetLife's interpretation and application of the Plan's definition of "Total Disability." As I noted previously, after 24 months, a claimant is deemed not to be

8

totally disabled under the plan unless he is "unable to perform the duties of any work or service for which he is reasonably qualified, taking into consideration [his] training, education, experience and past earnings" (emphasis added). MetLife construed the past earnings component of this definition in Lavoie's case to prohibit a claimant from collecting benefits if he has the capacity to earn at least 60% of his Basic Monthly Earnings before he became disabled.[4] Employing this

---

[4] MetLife did not disclose its interpretation of the past earnings provision in its letter terminating Lavoie's benefits. Nevertheless, diary entries made by the MetLife employee responsible for processing Lavoie's claim reveal the interpretation. On October 21, 1999, shortly after MetLife initially terminated Lavoie's benefits, the employee wrote "once [Lavoie's] rehabilitative earnings reach 60% of his pre-disability salary [he] will not meet definition of disabled and claim to be withdrawn." Record at 32. Several months later, after MetLife again terminated Lavoie's benefits, the employee explained the termination decision by stating in another diary entry:

> Two specific positions are cited in the [Labor Market Survey] indicating a salary of $30,000 and $31,200 plus commission. According to [Lavoie's] disability plan language commensurate coverage is the LTD benefit [defined in pertinent part as 60% of Basic Monthly Earnings] which is $4,974.10. Although not on commission, in 1999 he earned $14,500 in commissions and reported possibility of an additional $7,500 commission. As of 4/1/00 [Lavoie] is on straight commission, earning 1/3 of whatever

9

interpretation, MetLife denied Lavoie's claim because it determined that he had the capacity to replace at least 60% of his former earnings either by continuing to work at Prudential or by taking a job elsewhere as a financial planner.  I review both MetLife's interpretation of the Plan and its decision to terminate Lavoie's benefits using the deferential "arbitrary and capricious" standard of review.[5]  See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989);  Pari-Fasano v. ITT Hartford Life & Accident Ins. Co., 230 F.3d 415, 418-19 (1st Cir. 2000).

MetLife's interpretation of the past earnings provision cannot stand because it makes no sense when it is construed in the context of the Plan as a whole.  See Dallas County Hosp.

_____

> he bills for.  [Lavoie] has sustained this employment for two years, it is reasonable to expect he has potential to make commensurate wage.

See Record at 43-44 (emphasis added).

[5]  Lavoie recognizes that the Plan purports to give MetLife discretion to both interpret the Plan and make benefit determinations.  Nevertheless, he argues that its decision to terminate his benefits should be reviewed de novo because: (1) MetLife is neither the administrator of the Plan nor a Plan fiduciary; and (2) in any event, MetLife is a profit-making entity operating under a conflict of interest.  Because, as I explain below, both MetLife's interpretation of the Plan and its decision to terminate Lavoie's benefits were arbitrary and capricious, I need not determine whether its decisions should be reviewed with less deference.

10

<u>Dist. v. Associates' Health and Welfare Plan</u>, 2002 WL 1174250 (5th Cir. 2002) (terms of an ERISA plan must be construed by considering the plan documents as a whole); <u>Allison v. BankOne Denver</u>, 289 F.3d 1223, 1233 (10th Cir. 2002) (same). As I have noted previously, the Plan specifically authorizes a claimant who cannot return to his own job to engage in "Rehabilitative Employment" while collecting disability benefits. Rather than specifying a specific cap on the amount of money that a claimant can earn through such employment below which the benefit is unaffected but above which it is entirely eliminated, the Plan sensibly provides that, after 24 months of disability, the benefit payable will be reduced both by 50% of any earnings from Rehabilitative Employment and the amount, if any, by which the sum of the benefit and any income earned through Rehabilitative Employment exceed the claimant's Indexed Basic Monthly Earnings. Thus, as the claimant's income from Rehabilitative Employment rises to the point that, when combined with the benefit reduced by 50% of the income earned, it exceeds the claimant's Indexed Basic Monthly Earnings, subsequent increases in income will produce corresponding reductions in the benefit. The benefit will not be entirely eliminated, however, until the claimant has fully replaced his inflation-adjusted past earnings. MetLife's interpretation of the past earnings provision undermines this

11

carefully considered compensation scheme because it eliminates the claimant's right to collect any benefit as soon as he acquires the capacity to earn at least 60% of his Basic Monthly Earnings.

To illustrate the point, assume that Lavoie had actually earned $5,430 per month, the median wage for financial planners in New Hampshire according to MetLife's consultant.  Under the Plan's provisions governing Rehabilitative Employment, Lavoie's $4,974.11 monthly Benefit payment would be reduced by half of his earnings from Rehabilitative Employment to $2,259.11.  No further adjustment would be required because the sum of his reduced benefit payment and his earnings through Rehabilitative Employment ($7,689.11) would still be below his Indexed Basic Monthly Earnings ($9,491.40).[6]  Under MetLife's interpretation of the past earnings provision, however, Lavoie would not be entitled to collect any benefit because his actual earnings through Rehabilitative Employment establish that he has an earning capacity that is in excess of 60% of his Basic Monthly Earnings.  Interpreting the Plan's ambiguous past earnings

_____

[6] Lavoie earned $51,436.00 plus an undetermined amount in commissions in 1994, $115,049.79 in sales and commissions in 1995, and $131,960.07 in salary and commissions in 1996.  When averaged over 36 months, his Basic Monthly Earnings were thus $8,290.16.  If this figure is increased by 7% per year for two years it results in indexed Basic Monthly Earnings of $9,491.40.

12

provision to permit MetLife to deny Lavoie a benefit to which he is plainly entitled under other Plan provisions obviously is unreasonable.

Even if I were to accept MetLife's unreasonable interpretation of the past earnings provision, I could not accept its arbitrary determination that Lavoie had the capacity to earn at least 60% of his Basic Monthly Earnings by working as either a financial planner or a financial advisor. MetLife claims that Lavoie has the capacity to replace at least 60% of his Basic Monthly Earnings by working as a financial planner because: (1) the median salary for financial planners in New Hampshire exceeds 60% of Lavoie's Basic Monthly Earnings; and (2) Lavoie is qualified to work as a financial planner. To make this syllogism work, however, one must assume that Lavoie not only has the capacity to work as a financial planner but also that he has the capacity to earn as much or more than what half of the financial planners currently working in New Hampshire are able to earn. Because there is not a shred of evidence in the record to support this assumption,[7] MetLife cannot base its decision to terminate

_____

[7] In fact, substantial evidence in the record contradicts this assumption. Lavoie has a college degree in chemistry, and has no training in financial planning other than the training he received at Prudential. Dr. Levy has stated that Lavoie's MS limits his work week to no more than 40-50 hours, whereas successful financial planners regularly work far longer hours.

13

Lavoie's benefits on its conclusion that he has the capacity to work as a financial planner.

I also find no support in the record for MetLife's alternative determination that Lavoie has the capacity to earn an income comparable to his Basic Monthly Earnings by working as a financial analyst at Prudential. The most Lavoie ever earned at Prudential in any one year was $47,643.00. This represents a monthly income that is far below 60% of his Basic Monthly Earnings. MetLife has not explained why, in the face of this earning history, Lavoie's earnings capacity is far greater than what he actually earned. Accordingly, it acted arbitrarily in terminating Lavoie's benefits, even if its interpretation of the Plan is reasonable.

## CONCLUSION

Because MetLife's decision to terminate Lavoie's benefits was arbitrary and capricious, it is not entitled to summary judgment. Moreover, my reasoning suggests that Lavoie is entitled to prevail in this case. Thus, unless MetLife can show

---

Finally, Lavoie's actual earnings as a financial advisor were far below the median earnings for financial planners. Considering these factors together, no reasonable observer would conclude that Lavoie has the capacity to earn an above average salary as a financial planner.

14

otherwise on or before August 7, 2002, I propose to enter summary judgment in Lavoie's favor.

SO ORDERED.

_____
Paul Barbadoro
Chief Judge

July 12, 2002

cc:  Douglas Ingersoll, Esq.
     William Pandolph, Esq.